# Illinois Official Reports

## Appellate Court

---

*People v. Williams*, 2016 IL App (1st) 133459

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HALIK WILLIAMS, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-13-3459 |
| File<br>Rehearing denied | September 30, 2016<br>October 19, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 00-CR-3807; the Hon. Matthew E. Coghlan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Kieran M. Wiberg, all of State Appellate Defender's Office, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Margaret G. Lustig, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE NEVILLE delivered the judgment of the court, with opinion.<br>Justice Mason concurred in the judgment and opinion.<br>Presiding Justice Hyman specially concurred, with opinion. |

**OPINION**

¶ 1     Halik Williams, the defendant, appeals from the circuit court's dismissal, upon the State's motion, of his petition and supplemental petition for relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2004)). On appeal, defendant contends that the court erred in dismissing the petitions because he made a substantial showing that he was denied effective assistance of trial and appellate counsel. He also contends that the court erred because the petitions made a substantial showing of actual innocence based upon new evidence that establishes no one that defendant was accountable for caused the victim's death, and, therefore, the victim's death was not first degree murder. We affirm.

¶ 2     Following simultaneous, but severed, bench trials with codefendants Warren Hardy and David Sapp, defendant was found guilty of first degree murder based upon a theory of accountability. Defendant was sentenced to 30 years in prison.

¶ 3     The evidence at defendant's trial established that the victim, Anthony King, died from electrocution on the third rail of Chicago Transit Authority train tracks on September 5, 1999. The victim's death arose out of confrontation at the Morse Station platform between a group of Gangster Disciples consisting of defendant, codefendants, and Jason Moody, and a group of current and former Vice Lords consisting of the victim, Jonathan Lejman, Dennis Myles, and Dwayne Johnson.

¶ 4     At trial, Jason Moody testified that he was walking when he heard a "woo, woo" so he looked up and saw codefendant Sapp on the "el" platform waving him up. As Moody continued walking, he saw Lawrence Brooks sitting in a parked car and codefendant Hardy on the street. Codefendant Hardy said that some "hooks" were on the platform. Moody explained that "hooks" was a disrespectful term for members of the Vice Lords gang. Moody was a member of the Gangster Disciples and the Morse "el" stop was part of the gang's territory.

¶ 5     Once on the platform, Moody saw the victim and codefendant Hardy fighting on the train tracks. Codefendant Hardy was punching the victim, and the victim was trying to push codefendant Hardy away. At one point, Moody "heard sparks." The victim was on the third rail and codefendant Hardy was on the platform. Moody then saw defendant hit the victim on the head with a cane five times. After the fifth blow, the cane broke.

¶ 6     Jonathan Lejman testified that he was a former member of the Vice Lords and grew up with the victim. On the night of the victim's death, Lehman, the victim, Myles, and Johnson were celebrating both the victim's release from prison and the victim's birthday. Although the group exited the train at the Morse stop, they "had no business over there" because it was Gangster Disciple territory, so they went back up to the platform. Lejman, Myles and the victim sat on a bench. Johnson went to the other entrance of the platform.

¶ 7     Defendant, who was holding a cane, and codefendant Sapp then approached. Defendant asked if Lejman was "White C." Lejman stood up and replied that "White C" was dead. He stated that his group was not "on any gang banging or none of that"—that is, they were not looking for trouble. Codefendant Sapp replied, "We're hook killers." Lejman understood this to mean that codefendant Sapp's group belonged to the Vice Lords. As Lejman continued to say that his group was just trying to get home, he moved closer to defendant, who was "being fidgety," so that defendant would not be able to swing the cane at him. As Lejman moved closer, defendant said "Man, didn't I tell your bitch ass to back up off me?" Lejman backed up.

Shortly thereafter, defendant swung the cane at Lejman. Lejman, the victim, and Myles all ran to the end of the platform. Lejman jumped on the tracks and kept running. He stopped when he did not hear anyone behind him. When Lejman turned around, he saw defendant swinging a cane at someone on the tracks. He ran back and discovered the victim on the tracks.

¶ 8    Dennis Myles testified that although he was in a gang, he was not "gang banging" that night. When defendant took a swing at Lejman with the cane, Lejman ran away. Myles and the victim followed. When Myles saw Lejman jump onto the tracks and defendant "fixing to go after him," Myles turned around. Although the victim initially turned around, the victim then jumped onto the tracks. Myles followed the victim onto the tracks and ran past him. Myles then heard "Oh, we got one!" and turned around to see the victim "on the floor." Defendant was on the tracks, and he hit the victim three times in the head with the cane. During cross-examination, Myles acknowledged that he had made a statement to police which indicated that the victim jumped off the platform. However, he testified that that the person who transcribed his statement "didn't hear [him] all the way right," and that the statement was incorrect.

¶ 9    Detective Steve Schorsch testified that he and another detective spoke with defendant on September 7, 1999, in an interview room at Area 3. He was also present when defendant later spoke to an assistant State's Attorney. Defendant declined to make a written or videotaped statement; rather, defendant agreed to say what had happened. Schorsch took notes as defendant spoke. Defendant later reviewed these notes and agreed that they were accurate.

¶ 10    Defendant stated that he was driving with codefendant Sapp and Sapp's cousin, Lawrence Brooks, when he looked up and saw "White C." He told Brooks to pull over. Defendant and codefendant Sapp got out of the car. Defendant was holding a cane. Once up on the platform, codefendant Sapp stated, "They were Vice Lord killers, hook killers." Codefendant Hardy and Moody were also on the platform. Defendant asked one of the men if he was "White C." At one point "White C" and the two men with him began to run. Defendant chased "White C." The other two men ran toward codefendant Hardy. As defendant turned, he saw codefendant Hardy grab one of the men. He watched as codefendant Hardy and the man fell onto the train tracks. Codefendant Hardy pushed the other man onto the tracks and that man was "electrified."

¶ 11    Assistant Chief Medical Examiner Mitra Kalelkar testified that she performed an autopsy on the victim. She noted electrical burns on the victim's abdomen, hands, and left wrist. There were also lacerations and cuts on the victim's head and face. After an internal and external examination, she concluded that the victim died as the result of electrocution.

¶ 12    In finding defendant and codefendants guilty of first degree murder, the trial court relied on the common design rule as stated in *People v. Terry*, 99 Ill. 2d 508, 514-15 (1984). In denying defendant's motion for a new trial which argued, in pertinent part, that the victim's fall to the tracks was an accident after the completion of the underlying felony of assault or battery, the trial court stated that when two or more persons join together to commit an offense, even "a minor offense which involves violence," the parties are responsible for "everything" that occurs as a result of the agreement. The court stated that the circumstances of the case "all lead to the conclusion that these parties entered into an agreement to at least commit an assault or misdemeanor battery on the victim in this case, which resulted in his death." The court "agreed" that "perhaps" defendant and codefendants did not set out to commit a murder, "but they are responsible for all of the consequences of that which they did set out to do." The court then sentenced defendant to 30 years in prison.

¶ 13    On appeal, defendant contended that the evidence was insufficient to prove beyond a reasonable doubt that he was guilty of first degree murder pursuant to an accountability theory. Defendant argued, *inter alia*, that he did not have the intent or knowledge required to support a murder conviction.

¶ 14    In rejecting defendant's argument this court found that the evidence "clearly established" that defendant was not only present during the crime, but that he "actively devised and initiated the encounter" with the victim. See *People v. Williams*, No 1-03-0292, slip order at 9-10 (2005) (unpublished order under Supreme Court Rule 23). This court noted that defendant was the first to notice the Vice Lords on the platform, he directed Brooks to park, he confronted the Vice Lords on the platform, and he struck the victim five times on the head with a cane after the victim was electrocuted. *Id.* We therefore concluded that the trial court did not err in finding that there was a common design to establish defendant's intent, and properly held defendant accountable for the victim's death. *Id.* at 9.

¶ 15    In 2005, defendant filed a *pro se* petition for postconviction relief alleging, *inter alia*, that he was denied the effective assistance of trial counsel by counsel's failure to impeach Jason Moody with an affidavit in which Moody averred that he struck the victim on the head with a cane and to argue at trial that defendant was actually innocent because it was Moody, rather than defendant, who struck the victim on the head with a cane. Attached to the petition in support was defendant's unnotarized affidavit.

¶ 16    In his affidavit, defendant averred that Moody met with trial counsel's investigator sometime in 2000. Defendant further averred that trial counsel told him that during this meeting Moody admitted that Moody was the person who struck the victim with a cane after the victim was electrocuted. Defendant then averred that trial counsel "assured" him that counsel would subpoena the investigator to testify at trial regarding this meeting, and counsel would submit Moody's affidavit as evidence at trial. However, trial counsel did not submit the affidavit at trial. When defendant asked trial counsel why the affidavit was not submitted at trial and why counsel did not cross-examine Moody about the affidavit, counsel replied that he did not believe that the State had sufficient evidence to convict defendant, and he therefore did not think that he needed to present the testimony of the investigator at trial.

¶ 17    Defendant also averred that Moody came to visit him twice before trial. During the first meeting, Moody stated that if defendant wanted him to "tell the truth" defendant had to pay him $5000 before trial and $5000 after trial. During the second meeting, defendant told Moody that he needed more time to get the money. Moody responded that defendant's "time was up" and left. Defendant averred that although he told trial counsel and the jail's Office of Internal Affairs about the first meeting, so that the second meeting could be recorded, he did not receive a response from either the jail or trial counsel.

¶ 18    Defendant finally averred that he had tried unsuccessfully to obtain a copy of Moody's affidavit and the name of the investigator from trial counsel. However, trial counsel refused to disclose the name of the investigator or to give defendant a copy of Moody's affidavit and the discovery from the case because defendant had a balance due of $3400.

¶ 19    The circuit court docketed the petition and appointed postconviction counsel. In August 2011, postconviction counsel field a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. Dec. 1, 1984), stating that counsel had reviewed defendant's *pro se* petition for postconviction relief, certain police reports, other discovery material, the trial transcript, common-law record, and the order issued in defendant's direct appeal. The certificate further

- 4 -

stated postconviction counsel had communicated with defendant in person and over the phone and had interviewed or investigated "a number of witnesses" in an effort to further substantiate defendant's claims. The certificate finally stated that counsel was "unable to supplement or amend" defendant's *pro se* petition. The State then filed a motion to dismiss.

¶ 20    In December 2011, private counsel filed an appearance on behalf of defendant. In light of private counsel's statement to the court that a supplemental petition would be filed, the State requested and was granted leave to withdraw its motion to dismiss.

¶ 21    In January 2013, counsel filed a supplemental postconviction petition. The supplemental petition alleged that newly discovered evidence—the affidavit of codefendant Sapp—established that defendant was not guilty of murder because the victim fell onto the tracks accidently. The supplemental petition further alleged that defendant had made a substantial showing that there was a reasonable probability that a new trier of fact would find defendant not guilty of first degree murder and would instead, "at most," find him guilty of involuntary manslaughter. The supplemental petition finally alleged that trial counsel was ineffective because he failed to argue that defendant was guilty of the lesser-included offense of involuntary manslaughter. Attached to the supplemental petition in support was the affidavit of codefendant Sapp.

¶ 22    In his affidavit, codefendant Sapp averred that he told police that he, defendant, and codefendant Hardy went to the train platform in order to fight with rival gang members. Defendant walked up to Lejman (who was standing with the victim), Myles, and "Little Wayne." Defendant was holding a cane and swung it to prevent Lejman "from getting in his face." Lejman ran away and defendant chased him. The victim and Myles began to run after defendant but then turned around and ran the other way. At one point, Myles crossed in front of the victim, jumped down onto the train tracks, and ran away. This action seemed to "catch" the victim off guard, and the victim lost his balance and fell onto the tracks. Codefendant Hardy then either fell or jumped down. Codefendant Sapp averred that although he told the police that "the whole thing" was an accident, the police said that defendant and Moody had already made statements. The police told him what to say so that he could "go home." The State then filed a motion to dismiss. Attached to defendant's response to the State's motion was a notarized copy of defendant's original affidavit. The circuit court subsequently granted the State's motion.

¶ 23    On appeal, defendant contends that the circuit court erred when it granted the State's motion to dismiss because he made a substantial showing of a constitutional deprivation. Defendant first contends that he was denied the effective assistance of trial counsel because trial counsel failed to impeach Moody with evidence that it was Moody, not defendant, who struck the victim with a cane. Defendant further contends that he was denied the effective assistance of appellate counsel because appellate counsel failed to challenge the sufficiency of the evidence supporting defendant's conviction when the trial court found that neither defendant nor any codefendant had the "requisite mental state to commit first degree murder." Defendant finally contends that he has made a substantial showing of actual innocence based upon new evidence which established that no one that he was "accountable for" caused the death of the victim and, therefore, the victim's death could not be first degree murder.

¶ 24    The Act provides a procedural mechanism through which a defendant may assert a substantial denial of his constitutional rights in the proceedings which resulted in his conviction. 725 ILCS 5/122-1 (West 2004); *People v. Davis*, 2014 IL 115595, ¶ 13. If the circuit court does not dismiss the postconviction petition as frivolous or patently without merit,

then the petition advances to the second stage where counsel is appointed to represent the defendant, if requested (725 ILCS 5/122-4 (West 2004)), and the State is allowed to file responsive pleadings (725 ILCS 5/122-5 (West 2004)).

¶ 25 At the second stage of proceedings under the Act, it is the defendant's burden to make a "substantial showing of a constitutional violation." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). A "substantial showing" of a constitutional violation is a measure of the legal sufficiency of a defendant's well-pled allegations of a constitutional violation which, if proved at an evidentiary hearing, would entitle him to relief. *People v. Domagala*, 2013 IL 113688, ¶ 35. Therefore, all well-pled facts in the petition that are not positively rebutted by the trial record are taken to be true. *Pendleton*, 223 Ill. 2d at 473. If a defendant makes a substantial showing that his constitutional rights were violated, the matter proceeds to a third stage evidentiary hearing where the circuit court serves as a fact finder, resolves evidentiary conflicts, weighs credibility, and determines the weight to be given testimony and evidence. *Domagala*, 2013 IL 113688, ¶¶ 34, 46. We review the circuit court's dismissal of a postconviction petition at the second stage of proceedings under the Act *de novo*. *Pendleton*, 223 Ill. 2d at 473.

¶ 26 Defendant first contends that his petitions made a substantial showing that he was denied the effective assistance of trial and appellate counsel.

¶ 27 To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Specifically, "a defendant must prove that defense counsel's performance fell below an objective standard of reasonableness and that this substandard performance created a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). When challenging appellate counsel's performance, a defendant must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful. *People v. English*, 2013 IL 112890, ¶ 33.

¶ 28 Because the failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel (*People v. Enis*, 194 Ill. 2d 361, 377 (2000)), a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies" (*Strickland*, 466 U.S. at 697). Our supreme court has held that "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008). Thus, at the second stage of the proceedings under the Act, defendant has the burden to make a substantial showing that a reasonable probability exists that the outcome of the proceedings would have been different had his counsel's performance been different. See *People v. Harris*, 206 Ill. 2d 293, 307 (2002) (affirming the trial court's dismissal of an ineffective assistance of counsel claim without an evidentiary hearing where the defendant failed to make a substantial showing of prejudice).

¶ 29 Here, defendant contends that he was denied the effective assistance of trial counsel because counsel failed to impeach Moody with evidence that it was Moody, rather than defendant, who struck the victim with a cane. Defendant acknowledges that the affidavit in which Moody averred that it was he, rather than defendant, who struck the victim with a cane was not attached to either the *pro se* postconviction petition or the supplemental petition. Defendant also acknowledges that he did not attach affidavits from either Moody or trial

counsel regarding this affidavit, but argues that he cannot be expected to obtain affidavits in which counsel admits ineffectiveness or Moody admits perjury. He also explains that because he never knew the investigator's name, he could not obtain the investigator's affidavit. The State responds that defendant's petitions were properly dismissed because his unsupported allegations failed to make the requisite substantial showing of a constitutional violation.

¶ 30    Section 122-2 of the Act requires that a petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2004). The purpose for requiring "affidavits, records, or other evidence" is to establish that the allegations in a postconviction petition are capable of objective or independent corroboration. *People v. Delton*, 227 Ill. 2d 247, 254 (2008). The "affidavits and exhibits which accompany a petition must identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations." *Id.*

¶ 31    In the case at bar, defendant's contention that trial counsel failed to impeach Moody with an affidavit revealing that it was Moody, rather than defendant, who struck the victim with a cane lacks any evidentiary support. Even accepting defendant's argument that he cannot be expected to obtain an affidavit from trial counsel in which trial counsel admits ineffectiveness (see *People v. Hall*, 217 Ill. 2d 324, 333-34 (2005)), defendant has failed to attach an affidavit or exhibit containing evidence supporting his allegation. Defendant did not attach an affidavit from Moody or provide an affidavit from the investigator who obtained the affidavit at issue. In the absence of such affidavits, this court cannot determine whether the proposed witnesses could have provided testimony favorable to defendant, and further review of this claim is unnecessary. See *Enis*, 194 Ill. 2d at 380 (to sustain an ineffective assistance of counsel claim for counsel's failure to investigate or present a witness, the defendant's allegation must be supported by an affidavit from that witness that contains the witness's proposed testimony). Therefore, we conclude that because defendant failed to attach any witness affidavits to his petitions, his own affidavit notwithstanding, which support this allegation, he has failed to make a substantial showing that he was denied the effective assistance of trial counsel. See *Domagala*, 2013 IL 113688, ¶ 35.

¶ 32    Defendant next contends that he made a substantial showing that he was denied the effective assistance of appellate counsel because appellate counsel failed to argue on direct appeal that defendant could not be held accountable for the victim's murder because no one that he was accountable for had the requisite mental state to commit first degree murder. Defendant argues that in the absence of a principal who acted with the requisite mental state, it was inappropriate for the trial court to apply the common design rule to find him guilty of first degree murder under a theory of accountability.

¶ 33    To establish ineffective assistance of appellate counsel, a defendant must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful. *English*, 2013 IL 112890, ¶ 33. "Appellate counsel is not required to brief every conceivable issue on appeal, and counsel is not incompetent for choosing not to raise meritless issues." *People v. Maclin*, 2014 IL App (1st) 110342, ¶ 32. When the underlying issue has no merit, a defendant cannot show how he was prejudiced by appellate counsel's failure to raise that issue on appeal. *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011).

¶ 34    Here, defendant argues that appellate counsel should have relied upon the trial court's comment that neither defendant nor his companions had the requisite mental state to commit murder to argue that the evidence at trial did not prove defendant guilty of murder beyond a reasonable doubt. Thus, the question before this court is whether, had appellate counsel argued that defendant was not proven guilty beyond a reasonable doubt of murder because no one defendant was accountable for had the requisite mental state to commit first degree murder, this court would have reversed defendant's conviction.

¶ 35    Initially, we note that the State contends that this argument is barred by the doctrine of *res judicata* when this court on direct appeal considered and rejected defendant's contention that he was not proven guilty of first degree murder beyond a reasonable doubt because he did not have the requisite mental state to commit first degree murder. See *People v. Tate*, 2012 IL 112214, ¶ 8 (issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised but were not are forfeited).

¶ 36    However, in the instant appeal, defendant raises a different contention, whether his lawyer was ineffective for failing to argue that no one for whom he was accountable had the requisite mental state to commit first degree murder. A claim is not forfeited or otherwise procedurally barred when a postconviction petition alleges ineffective assistance of appellate counsel based upon a failure to raise that claim on direct review. See *People v. Youngblood*, 389 Ill. App. 3d 209, 214-15 (2009) ("it is well established that a postconviction claim will not be forfeited where the alleged forfeiture stems from the incompetence of appellate counsel"); *People v. Blair*, 215 Ill. 2d 427, 450-51 (2005) ("It has long been held that *res judicata* and forfeiture do not apply where fundamental fairness so requires; where the alleged forfeiture stems from the incompetence of appellate counsel; or where facts relating to the claim do not appear on the face of the original appellate record."). In the case at bar, because defendant contends that appellate counsel was ineffective for failing to challenge the sufficiency of the evidence based upon codefendants' lack of the requisite mental state to commit first degree murder, this issue is not procedurally barred, and we will therefore address it.

¶ 37    When reviewing a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. The trier of fact is responsible for evaluating the credibility of the witnesses, weighing witness testimony, and determining what inferences to draw from the evidence. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). This court reverses a defendant's conviction only where the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of his guilt remains. *Brown*, 2013 IL 114196, ¶ 48.

¶ 38    A person commits first degree murder when, in performing the acts which cause a victim's death, he knows that such acts will create a strong probability of death or great bodily harm to the victim. See 720 ILCS 5/9-1(a)(2) (West 1998). A person is legally accountable for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, or agrees or attempts to aid such other person in the planning or commission of the offense. 720 ILCS 5/5-2(c) (West 1998). A defendant may be deemed accountable for acts performed by another pursuant to a common criminal plan or purpose. *People v. Taylor*, 164 Ill. 2d 131, 140-41 (1995).

¶ 39    The common design rule provides that when two or more people engage in a common criminal design or agreement, any acts in the furtherance of that design or agreement committed by one party are considered to be the acts of all parties to the design or agreement, and all are equally responsible for the consequences of those further acts. *In re W.C.*, 167 Ill. 2d 307, 337 (1995). Proof of the common design need not be supported by words of agreement but may be drawn from the circumstances surrounding the commission of the act. *Taylor*, 164 Ill. 2d at 141.

¶ 40    Here, viewing the evidence at trial in the light most favorable to the State, as we must (*Brown*, 2013 IL 114196, ¶ 48), there was sufficient evidence to find defendant guilty beyond a reasonable doubt of first degree murder under an accountability theory. The evidence at trial established, through the testimony of Moody, Lejman, and Myles, as well as Schorsch's testimony regarding defendant's statement, that when defendant noticed a group of rival gang members on the platform, he told Brooks to stop the car and then went to the platform to confront them. Once on the platform, and after Sapp announced they were "hook killers," defendant approached Lejman and swung a cane at Lejman. In the ensuing chaos, codefendant Hardy grabbed the victim, and both men fell onto the train tracks. Specifically, Moody testified that codefendant Hardy and the victim fought on the train tracks, and defendant stated that codefendant Hardy pushed the victim onto the tracks causing the victim to be "electrified."

¶ 41    Defendant relies on the trial court's statements that it did not believe that defendant and codefendants intended to kill anyone, and he concludes that the facts, as found by the trial court, did not establish the necessary elements of first degree murder. We disagree.

¶ 42    *People v. Phillips*, 2014 IL App (4th) 120695, is instructive. In that case, the defendant intended to hit a woman named Frazier in the eye in retaliation for injuries she inflicted on the mother of his children. The defendant went to Frazier's home accompanied by his friend, Shaunessy Grimes. Grimes was to identify Frazier for the defendant because the defendant did not know her. Grimes brought a rifle along in order to protect the defendant while the defendant attacked Frazier. When the men arrived at Frazier's house, however, they saw a crowd of people. The defendant changed his mind about attacking Frazier and planned to leave because he was afraid he would be attacked by the crowd. Grimes then fired the rifle once. A member of the crowd was killed. The defendant later admitted his involvement in the shooting and was convicted of first degree murder and unlawful possession of a weapon by a felon pursuant to an accountability theory.

¶ 43    On appeal, the court affirmed the defendant's murder conviction, finding that he could not escape liability for the murder merely because his original intention was only to attack Frazier. *Id.* ¶¶ 31, 34. The court concluded that "[b]y attaching himself to a group bent on illegal acts, defendant became accountable for all the crimes of his companions, including the shooting." *Id.* ¶ 34. The court also noted that to be accountable for the shooting under the common design rule, the defendant need not have shared Grimes's intent to fire the rifle; rather, "[b]y setting out to commit a crime with Grimes, defendant rendered himself legally accountable for [the] shooting." *Id.* ¶¶ 44, 53.

¶ 44    The *Phillips* court also cited *People v. Tarver*, 381 Ill. 411 (1942), which involved two groups of young men, the Tarver group and the Walker group. After a member of the Tarver group got into a fight with a member of the Walker group, eight members of the Tarver group agreed to confront the Walker group. Mack, a member of the Tarver group, agreed to go only if he was assured there would be no shooting. However, Mack took a revolver along. During the

subsequent confrontation, Tarver took Mack's gun and fatally shot Lacey Walker. Mack was later convicted of murder under an accountability theory. In affirming Mack's conviction, our supreme court found that there was abundant evidence that the Tarver group "banded together" for the purpose of avenging the prior beating. *Id.* at 415. The court also noted that it was clear there was "ill feeling" between the two groups and that Mack was a member "of a gang assembled for the purpose of disturbing the peace and doing unlawful acts." *Id.* at 415-16. Therefore, "[a] shot fired by one of the defendants, under the circumstances shown, was a shot fired by all and all of them must answer for the result." *Id.* at 416.

¶ 45      Similarly here, it is clear that defendant and codefendants went to the train platform to confront rival gang members. Although it may be true that they did not intend to kill anyone at that time, ultimately, the result of the confrontation was codefendant Hardy and the victim fighting on the train tracks, which culminated in the victim being electrocuted. See *Terry*, 99 Ill. 2d at 515-16 (our supreme court acknowledged that the common design rule "does impose liability for murder even though a misdemeanor was originally intended").

¶ 46      Contrary to defendant's assertion, the State was not required to prove that defendant and codefendants shared the same intent with regard to the charged offense (*i.e.*, first degree murder). Rather, the State needed only to prove that defendant had the intent to promote or facilitate a crime. See *Phillips*, 2014 IL App (4th) 120695, ¶ 43. Under the common design rule, because the defendant and his codefendants were engaged in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties responsible for the consequences of those further acts. 720 ILCS 5/5-2 (c) (West 2010). By attaching himself to a group bent on an illegal action, defendant became accountable for all the crimes of his companions, including those of codefendant Hardy; defendant cannot "escape liability merely because his criminal intentions did not rise to the level of murder." *Phillips*, 2014 IL App (4th) 120695, ¶ 34.

¶ 47      As our supreme court has held, "there is no question that one can be held accountable for a crime other than the one that was planned or intended, provided it was committed in furtherance of the crime that *was* planned or intended." (Emphasis in original.) *People v. Fernandez*, 2014 IL 115527, ¶ 19.

¶ 48      In this case, this court cannot say that no rational trier of fact could have found defendant guilty of first degree murder pursuant to the common design rule when the evidence at trial established that defendant and codefendants were on the train platform (at defendant's behest according to his statement to the police) to confront the victim; that, Hardy, one of the defendant's companions, pushed the victim on the train tracks; and that Hardy's act created a strong probability of death or great bodily harm to the victim. *Terry*, 99 Ill. 2d at 515-16.

¶ 49      This court reverses a defendant's conviction only where the evidence is so unreasonable or unsatisfactory that a reasonable doubt of his guilt remains (*Brown*, 2013 IL 114196, ¶ 48); this is not one of those cases.

¶ 50      Defendant cannot show that he was prejudiced by appellate counsel's failure to raise this meritless issue on direct appeal. See *Lacy*, 407 Ill. App. 3d at 457 (if the underlying issue has no merit, defendant cannot show how he was prejudiced by appellate counsel's failure to raise it on direct appeal). Therefore defendant's petition failed to make a "substantial showing of a constitutional violation." *Domagala*, 2013 IL 113688, ¶ 35.

¶ 51      Defendant finally contends that he has made a substantial showing of actual innocence because codefendant Sapp's affidavit establishes that the victim fell onto the tracks after being

startled by Myles, and therefore, no one for whom defendant was accountable was responsible for the victim's death.

¶ 52     To "succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96. "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *Id.* Material means the evidence is "relevant and probative" of the defendant's innocence, and noncumulative means the evidence adds to what the factfinder heard at trial. *Id.* A reviewing court "must be able to find that petitioner's new evidence is so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *People v. Sanders*, 2016 IL 118123, ¶ 47. Well-pleaded factual allegations in the postconviction petition and its supporting evidence are taken as true unless they are positively rebutted by the record. *Id.* ¶ 48.

¶ 53     Defendant argues that codefendant Sapp's affidavit is newly discovered evidence because codefendant Sapp was simultaneously prosecuted for the victim's death so defendant had no way to obtain his testimony at trial, and that it is noncumulative in that it presents "a narrative of events that was not heard before." He further argues that taken as true Sapp's affidavit exonerates him because the act which caused the victim's death was committed by Myles rather than defendant or codefendants.

¶ 54     Initially, we note that codefendant Sapp's account of events is largely consistent with the sequence of events that was outlined at trial. Specifically, defendant and codefendants went to the platform to confront members of a rival gang; defendant engaged in a conversation with Lejman; defendant swung a cane at Lejman; and Lejman, Myles, and the victim ran away. It is only in the manner in which the victim ended up on the tracks that is "new," as codefendant Sapp avers that the victim was startled by Myles, lost his balance, and fell onto the tracks. Even if we accept defendant's conclusion that the facts contained in codefendant's Sapp's affidavit are new and noncumulative because he did not testify at defendant's trial, we cannot agree that codefendant Sapp's affidavit, taken as true, is of such a conclusive character that it would probably change the result at retrial. See *People v. Washington*, 171 Ill. 2d 475, 489 (1996) (the most important element of a claim of actual innocence is whether the evidence is of such conclusive character that it would probably change the result on retrial).

¶ 55     We find *People v. Edwards*, 2012 IL 111711, to be instructive. There, the defendant claimed actual innocence, in part, based on newly discovered evidence in the form of an affidavit from a codefendant, Eddie Coleman. The *Edwards* court found the codefendant's affidavit to be newly discovered evidence, due to the fact no amount of diligence could have forced the codefendant to violate his fifth amendment right to avoid self-incrimination if he chose not to do so. *Id.* ¶ 38. The *Edwards* court noted that the codefendant averred that the defendant " 'had nothing to do with this shooting' *** [and] was neither 'a part [of nor] took part in this crime.' " *Id.* ¶ 39. The *Edwards* court also noted that the codefendant "critically does not assert that petitioner was not *present* when the shooting took place." (Emphasis in original.) *Id.* The court then determined that the codefendant's affidavit did not raise the probability that, in light of the new evidence, it was more likely than not that no reasonable juror would have convicted the defendant. *Id.* ¶ 40. Finally, the *Edwards* court agreed with the appellate court's conclusion that the codefendant's averment, that he was the principal

offender, did not exonerate the defendant, who had been convicted of murder under an accountability theory. *Id.* ¶ 39.

¶ 56    Here, we find that codefendant Sapp's affidavit does not remove defendant from the train platform or the events leading up to the victim's death; rather, it offers an alternative explanation for how the victim ended up on the tracks. The evidence at trial established that the victim fell to the tracks as the result of a struggle with codefendant Hardy, whereas codefendant Sapp avers that the victim lost his balance after being startled by Myles.

¶ 57    Although codefendant Sapp avers that the victim lost his balance and fell onto the tracks, the fact remains that Moody testified at trial that he saw codefendant Hardy and the victim fighting immediately prior to the victim being on the tracks, and defendant stated that codefendant Hardy and the victim fell onto the tracks together. Accordingly, we cannot conclude that the information contained in codefendant Sapp's affidavit "is so conclusive that it is more likely than not that no reasonable juror would find [defendant] guilty beyond a reasonable doubt." *Sanders*, 2016 IL 118123, ¶ 47. Rather, we find that at best the evidence contained in the affidavit merely affects the issue of the sufficiency of the evidence and therefore does not totally vindicate defendant. See *People v. Adams*, 2013 IL App (1st) 111081, ¶ 36 (evidence of a defendant's actual innocence must support his total vindication or exoneration, not merely present a reasonable doubt as to his guilt). Therefore, defendant has failed to make a substantial showing of actual innocence. See *Domagala*, 2013 IL 113688, ¶ 35.

¶ 58    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 59    Affirmed.

¶ 60    JUSTICE HYMAN, specially concurring.

¶ 61    I agree with my colleagues that the trial court properly dismissed Williams's petition for postconviction relief. I write separately to elaborate on the evidence needed to prove accountability for first degree murder. The State must show not only that Williams possessed the necessary mental state to be accountable for the actions of his codefendants, but also that at least one person in the group possessed the necessary mental state for first degree murder. Williams argues that the State did not do so and so the evidence was insufficient. To the contrary, the State presented the necessary evidence and accordingly, I agree that his claim fails.

¶ 62    Accountability, in itself, is not a crime. *People v. Shaw*, 186 Ill. 2d 301, 325 (1998). Rather, it is a method of proving culpability for an underlying crime. *People v. Hicks*, 181 Ill. 2d 541, 547 (1998). The defendant is held accountable for the actions of the "principal" who commits the underlying crime.

¶ 63    Here, the underlying crime is first degree murder, and the State needed to present sufficient evidence of all its elements—including evidence of intent (knowing that the actions had a strong probability of causing death or great bodily harm to the victim). See *People v. McIntyre*, 2011 IL App (2d) 100889, ¶ 12 (to find defendant guilty under accountability theory, State must first establish *prima facie* case against principal). If the State does not establish the elements of the underlying crime as committed by the principal, then a defendant cannot be held accountable for aiding, abetting, or attempting to aid the principal in planning or

committing the offense. See *People v. Chirchirillo*, 393 Ill. App. 3d 916, 925 (2009) (defendant cannot be accountable for unlawful possession of weapon by felon where State failed to establish that principal was felon); see also *People v. Gibson*, 403 Ill. App. 3d 942, 950 (2010*), abrogated on other grounds by People v. Bailey*, 2014 IL 115459.

¶ 64        The State's choice to charge Williams on an accountability theory does not excuse the State from proving the elements of first degree murder. See *People v. Jaimes*, 2014 IL App (2d) 121368, ¶ 38 (to obtain conviction based on accountability, State must prove that principal actually committed offense). That element of intent for first degree murder is wholly separate and apart from the *mens rea* encompassed in the accountability statute, which requires that the accountable person have the intent to promote or facilitate the commission of the underlying crime. 720 ILCS 5/5-2(c) (West 1998).

¶ 65        In practice, we rarely need to unwind these two levels of intent.

¶ 66        Accountability cases generally fall into two groups. The first group is the "leader-follower" scenario, where the "leader" commits the murder but the "follower" is accountable. See, *e.g.*, *People v. Phillips*, 2014 IL App (4th) 120695, ¶ 34 (where Phillips and friend Grimes had common design to punch victim, Phillips was accountable for Grimes's actions in shooting another person when assault plan went awry). For example, defendants A and B agree to rob the victim. Defendant A shoots the victim but defendant B does not physically harm the victim at all. Defendant A has the requisite *mens rea* for first degree murder (knowing that shooting the victim has a strong probability of causing death or great bodily harm). Defendant A is the "principal."

¶ 67        Defendant B does not have that *mens rea* for first degree murder, but under the accountability statute, Defendant B can still be liable because he or she had a common design with A to commit the robbery. There is no question of who shot the victim, and no question that both the *mens rea* for first degree murder and the *mens rea* for accountability were present within this group of defendants. See *People v. Mischke*, 278 Ill. App. 3d 252, 262 (1995) (where codefendants involved in common design to commit aggravated assault or battery against victims, codefendants "did not have to actively participate in [victim's] murder in order to be guilty under the accountability theory").

¶ 68        The second common group of accountability cases is the "mystery shooter" scenario, when the chaos of the situation makes it impossible to tell who struck the fatal blow against the victim. See, *e.g.*, *People v. Cooper*, 194 Ill. 2d 419, 422-23 (2000) (codefendant gang members were both guilty of first degree murder by accountability, though it was unclear which codefendant actually shot at victims during confrontation with rival gang). Defendants C and D agree to rob the victim, but during the crime a gunshot rings out, striking and killing the victim. In the aftermath, no physical evidence indicates whether it was C or D who pulled the trigger, and neither will turn against the other. But we can infer that at least one of those defendants had the *mens rea* for first degree murder (because the victim was shot), and we need not identify the "principal" to hold both accountable for the murder (because both had a common design). See *id.* at 435-36 (defendants may be found guilty under accountability theory even if identity of principal is unknown, if each had common design).

¶ 69        Williams's case, as he presents it, is more unusual. He alleges that no one in the group of defendants (himself, Sapp, and Hardy) had the intent to kill Anthony King, and so he cannot be accountable for first degree murder because no murder occurred. See *People v. Griffin*, 247 Ill. App. 3d 1, 15 (1993) (if act committed by codefendants was not a crime, defendant cannot be

held accountable for it). But he omits the State's evidence that Hardy grabbed King, fought with him, and pushed him onto the train tracks. We can infer from this that Hardy, at least, had the *mens rea* for first degree murder. And we can infer from Williams's actions that he had a common design with Hardy. So his scenario is more like that of the "leader-follower" situation.

¶ 70      Williams is correct that the State needed to prove that the *mens rea* for first degree murder was present within the group of codefendants. A case could arise where the State would not be able to meet that burden (see, *e.g.*, *Chirchirillo*, 393 Ill. App. 3d at 925-26), but this is not that case.