2023 IL App (1st) 211120-U

No. 1-21-1120

Order filed March 14, 2023

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 11836 |
| | ) | |
| JAMES PARSON, | ) | Honorable |
| | ) | Brian K. Flaherty, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's second-stage dismissal of defendant's postconviction petition is affirmed where he failed to make a substantial showing that appellate counsel provided ineffective assistance by not challenging, on direct appeal, the sufficiency of the evidence to support the trial court's finding that defendant was guilty of aggravated battery with a firearm.

¶ 2    Defendant James Parson appeals the circuit court's dismissal of his postconviction petition at the second stage of proceedings under the Post-Conviction Hearing Act (Act) (725 ILCS 5/121-1 *et seq.* (West 2018)). On appeal, he contends the court erred in dismissing his petition because

appellate counsel was ineffective in failing to argue on direct appeal that the trial evidence was insufficient to prove him guilty beyond a reasonable doubt of aggravated battery with a firearm. We affirm.

¶ 3    Following the September 21, 2013, shooting of Rondale Standors, the State charged defendant and Andre Jackson with six counts of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014)), one count of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2014)), and two counts of aggravated discharge of a firearm (720 ILCS 24-1.2(a)(2) (West 2014)). Following a 2016 bench trial, defendant was convicted of aggravated battery with a firearm and sentenced to 25 years' imprisonment. The proceedings were detailed in our order on direct appeal. *People v. Parson*, 2018 IL App (1st) 162348-U. We restate the facts necessary to resolve the issue raised in this appeal.[1]

¶ 4    At trial, Standors testified that he had a pending charge for aggravated unlawful use of a weapon. On September 21, 2013, he was outside with several other people close to a parked vehicle on the 13800 block of South Park Avenue in Dolton. He heard five to eight gunshots, but denied he saw another vehicle. He identified photographs of the area where the shooting occurred and, viewing the photographs, testified he was near the front of the parked vehicle when shot. He was shot twice, once in the right thigh and once in the left side. He was transported by ambulance to a hospital, where he underwent surgery to repair a shattered bone.

¶ 5    Standors recalled speaking with Detective Major Coleman while hospitalized, but did not recall whether Coleman showed him photographs. Standors identified his signature on photo arrays

---

[1] Jackson was tried simultaneously by a jury and is not a party to this appeal.

in which the photograph of a person was circled, but testified he did not recall having signed them or having identified the person.

¶ 6    Presented with his written statement, Standors denied that he recognized it and denied recalling having signed it, but identified the signatures and initials that appeared on the statement as his. He denied recalling speaking with an assistant State's attorney (ASA), or identifying the shooter in a lineup at the Dolton police station on October 12, 2013. Standors denied having told the ASA the details of the shooting or seeing the shooter in the courtroom. Standors believed he told the ASA that Coleman had shown him a photo array at the hospital; however, he denied having identified the shooter, circling the shooter's photograph, or signing the photo array advisory form.

¶ 7    On cross-examination, Standors testified he was standing by a parked vehicle, not sitting on the fender, at the time of the shooting. He retreated when the shots were fired, and denied having seen a firearm or a vehicle or having given a description of the vehicle. He had "no clue" who shot him and, as he did not see the shooter's face, did not know whether defendant was the shooter. Standors testified that he did not recognize defendant, had "never seen him before," and denied that anyone in the courtroom was present at the time of the shooting. He denied having told the police that defendant shot him. He did not recall identifying the suspects from photographs, but agreed he recognized the signature on the photo array as his own and agreed that "at that time certainly it would have been more fresh in [his] mind than it would be today." He believed he was asked to attend a lineup at the police station about three weeks after viewing the photo arrays, but testified he "didn't pick out" or recognize anyone.

¶ 8    Through ASA Eleanor San, the State introduced Standors's written statement as substantive evidence. San testified that on September 25, 2013, she was assigned to speak with

Standors at the Dolton police station. After speaking with Detective Darryl Hope, San spoke with Standors in Hope's presence. San offered to write down a "summary of [Standors's] words" about the incident and proceeded to "speak with him in a question/answer format."

¶ 9    The State published Standors's statement over defendant's objection. In the statement, Standors relayed that he was 23 years old. At about 6:35 p.m. on September 21, 2013, he was sitting outside on the front fender on the driver's side of a friend's parked vehicle, facing south. He was speaking with others when someone said, " '[W]hat's up now[?]' "; he looked up and saw a burgundy vehicle, which he thought was a Chevrolet Impala, heading south. From about eight feet away, he saw a chrome-and-black firearm held out of the passenger's-side window. He fell, tried to pull himself behind his friend's vehicle, and saw he had been shot in the leg. After he was transported by ambulance to the hospital, a bullet was removed from his left leg, but another remained lodged in his right leg. While he was hospitalized, Coleman showed him a photo array, from which Standors identified the shooter. Standors circled the photograph and signed a photo array advisory form. The person Standors identified was depicted in a photograph appended to the statement.

¶ 10    San testified that Standors identified the person depicted in the photograph as the shooter.

¶ 11    On cross-examination, San agreed that the written statement summarized what Standors said and was not a verbatim recording, and that the interview was not recorded. Standors did not name the person he identified as the shooter from the photograph, and San did not, at the time, know the name of the person Standors identified.

¶ 12     Shaquilla Meeks testified that at the time of the shooting she knew Standors as "Ball," Corey Blanchard as "Blue," defendant as "Lord" or "Jamo," and Jackson as "Dre." Dre, Lord, and Blue were friends. In court, Meeks identified Jackson as Dre and defendant as Lord.

¶ 13     On September 21, 2013, at about 6:30 p.m., Meeks was in a vehicle charging her phone on the 13800 block of South Park when a shooting occurred. Meeks testified she did not see the shooter. She saw a "blackish" vehicle, but did not remember who was in the vehicle, the type of vehicle, whether anyone said anything before the shooting, how many shots she heard, the direction from which the shots were coming, or where the vehicle went after the shooting.

¶ 14     Meeks testified she did not recall whether she went to the Dolton police station on September 24, 2013. Presented with photo arrays in court, she identified her signature and initials and identified a person in a circled photograph as Lord, but denied recalling having circled the photograph or having identified him as the shooter. She similarly identified the man in another circled photograph as Blue, but denied recalling having identified him as an occupant of the vehicle.

¶ 15     Presented with her written statement of September 24, 2013, Meeks verified her signatures thereon, but denied recalling having signed it or having spoken with Hope and an ASA on that date. She identified the persons whose photographs were appended to her statement as defendant and Blanchard. She denied recalling having told an ASA that she saw Jackson's maroon Impala approach slowly with Jackson behind the wheel, that defendant discharged the firearm about five times, that she saw Standors try to run before he fell, or that she heard people in the Impala yell at Jackson to drive away. Further, Meeks denied that she met Blanchard and defendant that evening, that defendant told her that "he would do that to [her]" if she said what she knew, or that she took

this to mean he would shoot her. Meeks also denied recalling whether she met with Hope on October 12, 2013. Although she confirmed that the signature on the photo array documents identifying Jackson was hers, she testified she did not recall having identified him in the photograph, or identifying defendant in a lineup, at the Dolton police station that day.

¶ 16    Meeks denied recalling having testified before a grand jury and denied having identified defendant before a grand jury. The State confronted her with her testimony from the grand jury proceedings. The State asked her if she remembered testifying before the grand jury that she saw the faces of the people in the Impala from which defendant was shooting; that Blanchard was in the back middle seat, Jackson was driving, and defendant was in the front passenger's seat; that defendant said, "[W]hat's up now" and fired a chrome-and-black handgun; that she heard about five gunshots and some of the bullets hit the vehicle in which she was sitting; that defendant was "screaming" at the driver to "pull off"; that the Impala drove away after the shooting; and that Standors tried to run, but fell when his "bone popped out of his leg." Presented with such details of her grand jury testimony in question and answer format, Meeks, at trial, either denied recollection or testified she did not know whether she had thus testified.

¶ 17    On cross-examination, Meeks testified that she had a memory problem due to head trauma. Sometime after the shooting, she sustained a "bump" on her head when she was "jumped on" by "four boys," punched, and "tased in the eye." She did not recall whether defendant or Jackson were at the scene of the shooting, as it happened "two years ago." She did not know who shot Standors and did not recall whether she saw anyone with a firearm that day.

¶ 18    Through ASA Anna Sedelmaier, the State introduced Meeks's written statement as substantive evidence. Sedelmaier testified that on September 24, 2013, she was assigned to

interview witnesses at the Dolton police station, where she spoke with Hope and then Meeks. Meeks agreed to provide a written statement. Sedelmaier prepared the typewritten statement by asking Meeks questions and summarizing her answers.

¶ 19    The State published Meeks's written statement over defendant's objection. In the statement, which Sedelmaier read into the record, Meeks relayed that on September 21, 2013, she saw defendant shoot Standors on the 13800 block of South Park. Meeks was then 18 years old. Shortly after 6 p.m., she was in a friend's parked vehicle attempting to charge her phone, while Standors, whom she knew as Ball, stood in front of the vehicle. A maroon Impala she recognized as belonging to Jackson, whom she knew as Dre, turned the corner and slowly approached. Jackson was driving, and defendant, whom she knew as Lord or Jamo, was in the passenger seat; in the back of the vehicle was Blanchard, nicknamed Blue, whom she had known for four years. Defendant said, "[W]hat's up now" before he displayed a silver-and-black handgun and fired it four or five times. Standors fell, and everyone around Meeks fled. People in the vehicle "scream[ed]" at Jackson to drive away, and the Impala drove away slowly.

¶ 20    After the shooting, Meeks checked on Standors and others called 911. Meeks walked home and talked to her mother, but then returned to the scene and spoke to the police. About two hours after the shooting, Blanchard called Meeks, and she told him that she saw Blanchard, Jackson, and defendant in the Impala and saw defendant shoot at Standors. Meeks and Blanchard made plans to meet that night at a gas station. When they met, defendant was also present. During the course of the evening, defendant told Meeks that if she said anything about the shooting "he would do that to her," which she interpreted as a threat to "shoot her too" if she implicated him.

¶ 21    Sedelmaier testified that she and Hope, as well as Meeks, signed each page of the statement. Meeks wrote the names "Corey Blanchard" and "Blue" on a photograph appended to her statement, and she identified him as the person in the back seat of the Impala. Another appended photograph bore the names "Lord" and "Jamo," whom Meeks identified as the person who sat in the Impala's front passenger seat and shot Standors. Meeks signed and dated the appended photographs to reflect the identifications of Blanchard as the person in the back seat and defendant as the shooter.

¶ 22    ASA Jason Coelho testified that on October 1, 2013, he met Meeks just before he examined her before the grand jury. Presented with a transcript, he testified it was a true transcription of her grand jury testimony. As read by the ASA and Coelho at trial, Meeks's grand jury testimony was consistent with her written statement. Specifically, Meeks testified before the grand jury that Dre's Impala rounded the corner, with Blanchard, whom she knew as Blue, in the middle back seat and defendant, whom she knew as Lord, in the passenger seat; that defendant leaned out the window and said, "[W]hat's up" before he drew a silver-and-black handgun and "started shooting"; that she heard five gunshots; that Standors tried to run, but fell when a "bone popped out of his leg"; that those in the Impala, particularly defendant, "scream[ed ']pull off' "; that when Blue called a few hours later she agreed to meet him; that after meeting they went to another location where defendant was present; that defendant told her, "[I]f you snitch, I'm gonna do that to you"; that Meeks believed this meant that defendant would kill her; and that she spoke with Hope and an ASA on September 24, 2013.

¶ 23    Alfred Rowels testified that he had been convicted of aggravated unlawful use of a weapon in 2010 and possession of cannabis with intent to deliver in 2014 and was on probation. On September 21, 2013, at about 6:30 p.m., he was in his vehicle on Kanawha Street when he observed

a burgundy Impala he had previously seen around the neighborhood. He recognized the driver as Dre, but did not know his full name. Rowels recognized the front passenger seat occupant as defendant, whom Rowels knew as James or Jamo. In court, Rowels identified Jackson, whom he knew as Dre, as the driver, and defendant, whom he knew as James or Jamo, as the front seat passenger. A third occupant, whom Rowels could not identify, was in the back seat with his head down. As the Impala drove past, Dre nodded to Rowels and then turned right onto 138th Place heading toward Park. "Seconds later," Rowels heard 8 to 10 gunshots from Park. Rowels drove away before the police arrived. On October 12, 2013, Rowels met with Hope at the police station and, from a photo array, identified the driver of the Impala by circling a photograph and writing "Dre." On the same date, Rowels identified, in a physical lineup, "James" (defendant), whose full name Rowels did not know, as the front seat passenger.

¶ 24    On cross-examination, Rowels testified that the passenger's side of the Impala was closest to him as it passed and that the windows were down. He did not see a firearm. After hearing the gunshots, he drove in the opposite direction and did not go to the police that day.

¶ 25    Hope testified he responded to the scene on September 21, 2013.[2] Among several persons present, only Meeks spoke to the police. Meeks met Hope at the police station the next day and named men she knew as Jamo, Blue, and Dre. Hope learned that Jamo was defendant and Blue was Blanchard and created photo arrays that included them. On October 2, 2013, Hope obtained a warrant for defendant, who was arrested on October 11, 2013. The next day, from a physical lineup, Meeks and Standors each identified defendant as the shooter, and Rowels identified him as the person he had seen in the burgundy Impala's front passenger seat before the shooting.

---

[2] Hope testified that he held the rank of commander at the time of trial.

¶ 26    Coleman testified that on September 24, 2013, Standors identified defendant as the shooter from one of two photo arrays Hope showed Standors. The other array included Blanchard, but Standors did not identify him. That same day, Meeks identified defendant from the first photo array as the person who was leaning out of the vehicle shooting and identified Blanchard from the second photo array as the person in the back seat of the same vehicle.

¶ 27    On cross-examination, Coleman testified that, at the hospital, Standors received an intravenous drip from a bag labeled "saline," and that Standors denied being on medication. From the first photo array, Standors identified defendant as the shooter and, in doing so, "didn't hesitate. He didn't stutter. It didn't take him very long." Standors did not specify defendant's position in the vehicle. On September 24, 2013, Coleman met with Meeks at the police station. "[W]ithout any hesitation or delay," she recognized Jamo as the shooter. In a second photo array, she identified Blanchard as the person who sat in the back seat.

¶ 28    An Illinois State Police (ISP) trooper crime scene investigator testified that on September 21, 2013, he found casings, deformed bullets, and blood on the roadway at the scene of the shooting and that, based on his findings, at least eight bullets had been fired. The State entered a stipulation that, if called, a forensic investigator of the ISP Crime Lab would have opined that nine fired cartridge casings he received from the Dolton Police Department had been fired from the same firearm.

¶ 29    Counsel for defendant moved for a directed finding, arguing that Standors failed to identify anyone in the passing vehicle and that Meeks could not remember pertinent information about the incident. Counsel questioned the credibility of the ASA witnesses and argued the State had caused

Meeks to testify before the grand jury in order to "lock in" her testimony "[b]ecause she can't be trusted" and might otherwise have "change[d] her story." The court denied the motion.

¶ 30 After hearing closing arguments, the trial court found defendant not guilty of attempted first degree murder or aggravated discharge of a firearm in the direction of a vehicle that was known or should have been known by him to have been occupied by a person, but guilty of aggravated battery with a firearm and aggravated discharge of a firearm in the direction of another person. Defendant filed a motion for a new trial, arguing the evidence was insufficient to support the guilty finding, which was denied.

¶ 31 The trial court merged the aggravated discharge count into the aggravated battery count and sentenced defendant to 25 years' imprisonment for aggravated battery. Defense counsel's motion to reconsider the sentence was denied.

¶ 32 Defendant filed a direct appeal, arguing only that his sentence was excessive. *Parson*, 2018 IL App (1st) 162348-U, ¶¶ 1-2. We affirmed. *Id.* ¶ 28.

¶ 33 On February 4, 2019, defendant, through new counsel, filed a postconviction petition under the Act. Defendant argued, *inter alia*, that appellate counsel was ineffective in failing to challenge the sufficiency of the evidence to support the guilty findings; that Standors did not identify him in court; and that the trial court's reliance on prior inconsistent statements of Standors and Meeks under a statutory exception to the hearsay rule (725 ILCS 5/115-10.1 (West 2014)) was improper because "[t]here was no meaningful corroboration *** to bolster the 115-10.1 material from" these witnesses.

¶ 34   Defendant's petition also stated that his conviction should be reversed on the basis of actual innocence, but cited neither authority nor factual support for the claim. His notarized affidavit attached to the petition stated:

> "I am asserting a claim of actual innocence in these proceedings. Myself, and my mother, objected to appointed appellate counsel raising only a sentencing issue in my direct appeal. I advised counsel that I also wanted raised, the issue of reasonable doubt, and the fact of my actual innocence."

¶ 35   Also attached were this court's order on direct appeal, a document titled "Synopsis" that characterized the testimony of various witnesses, and excerpts of transcripts of defendant's bench trial and cross-examinations by Jackson's counsel in Jackson's jury trial.

¶ 36   On May 3, 2019, the circuit court docketed the petition for second-stage proceedings. The State filed a motion to dismiss the petition, arguing that defendant failed to show appellate counsel's decision not to argue the insufficiency of the trial evidence was objectively unreasonable or prejudiced him. As to defendant's claim of actual innocence, the State argued that defendant failed to assert facts or to provide evidentiary support of his innocence.

¶ 37   After hearing arguments, the circuit court granted the State's motion on May 21, 2021. In its oral ruling, the court noted that appellate counsel's choice regarding what issues to raise on appeal is entitled substantial deference and that defendant failed to show why counsel was unreasonable for not challenging the sufficiency of the evidence on direct appeal or how defendant was prejudiced as a result. The court also found that defendant "failed to provide any, and I stress any, evidence of actual innocence."

¶ 38    Defendant appeals, arguing he has made a substantial showing of ineffective assistance of appellate counsel for failing to argue on direct appeal that the trial evidence was insufficient to support his conviction.

¶ 39    The Act "provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated at trial or sentencing." *People v. Dupree*, 2018 IL 122307, ¶ 28. If the circuit court does not summarily dismiss the petition as "frivolous" or "patently without merit" at the first stage of proceedings and within 90 days of the filing, the petition advances to the second stage under the Act. 725 ILCS 5/122-2.1, 122-5 (West 2018). The State may then either answer the petition or move to dismiss it. *Dupree*, 2018 IL 122307, ¶ 28 (citing *People v. Domagala*, 2013 IL 113688, ¶ 33).

¶ 40    In considering a motion to dismiss at the second stage, the court must determine whether the defendant has made a "substantial showing," based on the allegations in the petition supported by "affidavits, records, or other evidence" (725 ILCS 5/122-2 (West 2018)), that his rights under the federal constitution or the Illinois constitution have been violated. *Dupree*, 2018 IL 122307, ¶ 28. Based on such a "substantial showing," the circuit court will advance the claim to the third stage for an evidentiary hearing; otherwise, the petition will be dismissed. 725 ILCS 5/122-2.1, 122-6 (West 2018). We review *de novo* a circuit court's dismissal of a petition at the second stage. *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 21.

¶ 41    At the outset, we reject the State's contention that any challenge to the sufficiency of the evidence is forfeited because defendant could have raised it on direct appeal. In the context of petitions under the Act, the doctrine of forfeiture is relaxed where the forfeiture stems from the ineffective assistance of appellate counsel. *People v. English*, 2013 IL 112890, ¶ 22.

¶ 42    The right of a defendant to effective assistance of counsel is constitutionally guaranteed. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 73 (citing *Domagala*, 2013 IL 113688, ¶ 36). A challenge to counsel's performance is subject to the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court. *People v. Lacy*, 407 Ill. App. 3d 442, 456 (2011) (citing *People v. Colon*, 225 Ill. 2d 125, 135 (2007)).

¶ 43    The *Strickland* standard applies equally to claims concerning trial and appellate counsel. *People v. White*, 2021 IL App (1st) 170903, ¶ 38. Under *Strickland*, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Lacy*, 407 Ill. App. 3d at 456-57. Where a defendant claims ineffective assistance of counsel in a petition at the second stage under the Act, he must make a "substantial showing" of each prong. *White*, 2021 IL App (1st) 170903, ¶ 35 (citing *Domagala*, 2013 IL 113688, ¶ 36). If an issue would have been meritless on direct appeal, a substantial showing of resulting prejudice cannot be made based on appellate counsel's failure to raise the issue. *People v. Williams*, 2016 IL App (1st) 133459, ¶¶ 47-50 (affirming second-stage dismissal of petition alleging ineffective assistance of appellate counsel where we could not conclude, based on the evidence, that no rational trier of fact could have found defendant guilty).

¶ 44    When reviewing the sufficiency of the evidence at trial, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "

(Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). A conviction may be reversed only where the trial evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *People v. Brown*, 2013 IL 114196, ¶ 48. The trier of fact is responsible for evaluating the credibility of the witnesses, weighing witness testimony, and determining what inferences to draw from the evidence. *Id.*

¶ 45    Defendant was convicted of aggravated battery with a firearm. In order to sustain his conviction, the State was required to prove that, while committing a battery, he knowingly discharged a firearm and caused injury to Standors. 720 ILCS 5/12-3.05(e)(1) (West 2012).

¶ 46    Defendant does not dispute that a firearm was discharged or that Standors was shot twice and injured. Rather, he argues that the evidence presented at trial regarding his identity as the shooter was incredible and, thus, had appellate counsel challenged the evidence on direct appeal, the outcome of the proceeding would have been different. We disagree.

¶ 47    The record shows that two witnesses, Standors and Meeks, identified defendant as the shooter in written statements that were introduced as substantive evidence. These statements contradicted their trial testimony that they did not recall identifying or had not identified defendant as the shooter. Standors, in his statement, recounted that, while sitting on a friend's parked vehicle, he heard someone say, " '[W]hat's up now[?]' "; he looked up and saw a burgundy vehicle, which he thought was a Chevrolet Impala, heading south. From about eight feet away, he saw a chrome-and-black firearm held out of the passenger's-side window. While hospitalized, he identified defendant as the shooter from a photo array. He later identified defendant as the shooter from a physical lineup.

¶ 48    Meeks, in her written statement, related that she saw defendant shoot Standors. Specifically, she recounted that she was in a friend's parked vehicle attempting to charge her phone, while Standors was in front of the vehicle. A maroon Impala she recognized as belonging to Jackson, whom she knew as Dre, turned the corner and slowly approached. Jackson was driving, and defendant, whom she knew as Lord or Jamo, was in the front passenger seat. Meeks heard defendant say, "[W]hat's up now" before he displayed a silver-and-black handgun and fired it four or five times. Meeks further recounted that Blanchard called her about two hours after the shooting, and she told him that she saw him, Jackson, and defendant in the Impala and saw defendant shoot at Standors. She and Blanchard made plans to meet that night. During the course of the evening, defendant, who was also present, told her that if she said anything about the shooting "he would do that to her," which she interpreted as a threat to "shoot her too" if she implicated him. Meeks identified defendant from a photo array as the person who sat in the Impala's front passenger seat and shot Standors. She also identified him as the shooter from a physical lineup. Coelho, who examined Meeks before the grand jury, testified that the transcript of that testimony, in which she testified that defendant was the shooter, was accurate.

¶ 49    The State also presented the testimony of Rowels, who corroborated portions of Standors's and Meeks's written statements. Rowels stated that he was in his vehicle near the scene and saw a burgundy Impala he recognized from the neighborhood. He saw the driver of the Impala nod at him and identified two of the occupants—the driver, whom Rowels knew as Dre, and defendant, in the front passenger seat, whom Rowels knew as Jamo or James. Rowels also saw that a third person was in the back seat. Rowels testified that, "[s]econds" after the Impala turned off 138th toward Park, he heard 8 to 10 gunshots. A few weeks later, Rowels identified defendant in a lineup

as the person he saw in the front passenger seat and identified Jackson as the driver. The witness accounts of a single shooter and multiple gunshots were corroborated by forensic evidence showing that about nine bullets had been fired from the same firearm.

¶ 50    This evidence, viewed in a light most favorable to the State, was sufficient for a rational trier of fact to conclude that defendant was the shooter and to sustain his conviction for aggravated battery with a firearm. As such, defendant cannot show that he was prejudiced by appellate counsel's failure to challenge the sufficiency of the evidence on direct appeal where such a challenge would be meritless. *Williams*, 2016 IL App (1st) 133459, ¶¶ 47-50.

¶ 51    Nevertheless, defendant contends that appellate counsel's decision not to argue that the evidence was insufficient to support the conviction was unreasonable and that he was prejudiced as a result. Although defendant does not contend that the State failed to establish the statutory requirements for admitting the witnesses' prior inconsistent statements under section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2014))—a statutory exception to the hearsay rule—he claims the trial court misapplied section 115-10.1, because no evidence meaningfully corroborated those prior inconsistent statements. In support, he claims that the "type of evidence" the State presented at trial was found to be insufficient to prove guilt beyond a reasonable doubt in *People v. Arcos*, 282 Ill. App. 3d 870 (1996).

¶ 52    We initially note that the fact that Meeks and Standors recanted does not require that their prior inconsistent statements be corroborated. See *People v. Davis*, 2018 IL App (1st) 152413, ¶ 48 ("The fact the witnesses recanted their identifications at trial and the convictions rest primarily on the witnesses' properly admitted prior inconsistent statements without corroboration does not warrant reversal."); *People v. Douglas*, 2014 IL App (5th) 120155, ¶ 28 ("[E]ven if there is no

corroborative evidence, a recanted prior inconsistent statement admitted under section 115-10.1 can support a conviction.").

¶ 53     In any event, *Arcos* is inapposite. In that case, the reviewing court reversed the defendant's conviction where the sole evidence was the prior statement of a single witness whom the trial court found to be a " 'thoroughly disreputable person who cannot be believed.' " *Arcos*, 282 Ill. App. 3d at 871. In this case, as noted, the State presented the prior statements of Standors and Meeks identifying defendant as the shooter. Coelho testified as to the accuracy of the transcript of Meeks's grand jury testimony in which she testified that defendant was the shooter, and Rowels placed defendant near the scene of the shooting in a vehicle matching the description given by Standors and Meeks, moments before the shooting occurred.

¶ 54     Nor can we find, as defendant urges, that appellate counsel's failure to raise the insufficiency argument rendered his performance ineffective because no witness identified defendant as the shooter at trial and because no physical evidence tied him to the crime. The absence of such evidence neither precludes a conviction nor necessitates reversal. *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 55 (noting, as to first degree murder case where none of the physical evidence was tied to the defendant and no witnesses claimed to have observed the crime, that "it is well settled in Illinois that a conviction can be sustained solely on circumstantial evidence").

¶ 55     Defendant's reliance on *People v. Warren*, 2022 IL App (1st) 190330-U, is also misplaced. See Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021) (nonprecedential appellate court orders entered on or after January 1, 2021, may be cited for persuasive purposes). There, the defendant alleged a different deficiency by appellate counsel that is inapposite to the issue in this appeal. See *Warren*, 2022 IL App (1st) 190330-U, ¶¶ 1-2 (reversing second-stage dismissal of postconviction petition

where circuit court conducted an improper hearing under *People v. Krankel*, 102 Ill. 2d 181 (1984), and appellate counsel failed to raise the issue on appeal).

¶ 56    In sum, after reviewing the record on appeal, we find the circuit court did not err in dismissing defendant's petition at the second stage where he failed to show that he was prejudiced by appellate counsel's decision to forego challenging the sufficiency of the evidence on direct appeal. Because such a challenge would have lacked merit, defendant cannot show prejudice, and, thus, has failed to make a substantial showing of a constitutional violation. See *Domagala*, 2013 IL 113688, ¶ 35.

¶ 57    Finally, we likewise reject defendant's passing suggestion in his brief that we reverse the circuit court's decision on the basis of his "actual innocence." A claim of actual innocence requires supporting evidence that is (1) newly discovered, (2) material and noncumulative, and (3) of such conclusive character that it would probably change the result on trial. *People v. Robinson*, 2016 IL 123849, ¶ 47. "To advance to a third-stage evidentiary hearing on an actual innocence claim, the defendant must make a substantial showing that it is more likely than not that no reasonable trier of fact would find him guilty beyond a reasonable doubt." *People v. Martinez*, 2021 IL App (1st) 190490, ¶ 114. As noted by the circuit court, defendant's allegation of actual innocence is conclusory and unsupported by evidence. Further, because defendant's brief on appeal cites neither factual support nor legal authority for his claim, we find the argument forfeited pursuant to Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). See *People v. Rosalez*, 2021 IL App (2d) 200086, ¶ 170 (this court " 'is not a repository into which an appellant may foist the burden of argument and research' " and may reject arguments that are not " 'clearly defined with pertinent

authority cited and cohesive arguments presented' ") (quoting *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010)).

¶ 58    For these reasons, we affirm the order of the circuit court of Cook County dismissing defendant's postconviction petition.

¶ 59    Affirmed.